GEORGE A. PERRY *et al.*, Executors, *vs.* ROBERT P. BROWN *et al.*

MAY 1, 1912.

PRESENT: Dubois, C. J., Johnson, and Parkhurst, JJ.

*(1) Wills. Construction.*

In the construction of a will, the intent of testator must be gathered from the whole will, and to ascertain the intention the court will consider the circumstances under which it was written, in order to look at it as far as possible from the testator's point of view.

*(2) Wills. Nature of Estates Created.*

Will construed and *held;* that while testatrix used language in the first instance, appropriate for the creation of a legal life estate in the entire residuary property, real and personal, the scheme of the will was based upon the establishment of a trust estate, entitling the husband to an equitable interest in the income only.

*(3) Will. Life Estates.*

Will construed and *held;* that language showing intention of giving husband of testatrix a life estate in the whole income was modified by later provisions showing intention that income from estate of husband should be used up

for his support and only such portion of estate of testatrix should be used as became necessary, after his own resources were exhausted.

### (4)  *Wills.  Construction.*

The fact that testatrix used words in a provision of a holographic will which in their technical meaning would create a life estate, will not be allowed to override the plain intent of the provisions taken as a whole, so as to prevent the creation of a trust estate or to nullify other provisions of the will relating to the disposition of the income by the trustees.

### (5)  *Wills.  Technical Words.*

Where the context or other parts of a will indicate that technical words are not used in their ordinary technical meaning, they will be interpreted in the sense intended by testator.

### (6)  *Wills.  Accumulation of Income.*

Will construed and *held;* that from the language "all income exceeding what is necessary for taxes, repairs, incidental expenses and salary of trustees to be credited to my estate, but to be used freely for the benefit of my husband, whenever his own income does not prove sufficient; but always his own income is first to be expended upon him and then when necessary falling back upon the income accruing from my trust estate."

"And all of the residue of the net income, to pay to my husband for his own use if he be able to care for and use the same, if not, deposit it in the name of my trust estate to be used for any necessity for his comfort," it was the intent of testatrix that the trustees should accumulate the income, over and above such portion as might be expended for the support of the husband, and such accumulated income became a part of the trust estate to be distributed in accordance with the subsequent provisions of the will.

### (7)  *Wills.  Accumulation of Income.*

If a part of the income of a trust estate is undisposed of, the trustees should, even in the absence of any provision, accumulate it and pay it to the legatees entitled to the original corpus of the estate.

### (8)  *Wills.  Income.  Anticipating Payment.*

Upon the question of anticipating the payment of surplus income during the life time of the life-tenant of a portion of such income, while it appeared that in all probability the principal of the trust estate would be sufficient to pay the pecuniary legacies, yet as large portions of both real and personal estate were specifically devised and bequeathed and other portions would have to be sold to raise the necessary funds, and it could not be known what would be realized from such sales, the court is not warranted in ordering payment of such income from time to time during life of life tenant, because it could not be determined at this time whether there was sufficient property to carry out all the provisions of the will and leave the accumulated income intact and for the further reason that the vested remainder was subject to open and let in any grandchildren born after death of testatrix, who might become entitled to share in the distribution of the residuary estate of which the accumulated income formed a part.

*(9)   Wills.   Vested Remainders.*

After leaving such portion of the income of a trust estate as was necessary for support of life tenant the residuary gift was as follows:—"Whatever may now be left of the so-called trust estate, I bequeath to the children and grandchildren of Maria and William Whipple Brown, of Providence, and Charlotte Perkins Gilman and daughter Catherine Stetson, to be equally divided, share and share alike."

*Held,* that the children and grandchildren of William Whipple Brown, together with Charlotte Gilman and Catherine Stetson, together took a vested remainder in the residuary estate at death of testatrix, subject to the limited equitable life estate.

*Held,* further, that a grandchild who deceased after death of testatrix, being entitled to a vested estate in remainder, her interest in the real estate descended to her heirs and in the personal property, to her husband, unless disposed of by her will.

*Held,* further, that the children and grandchildren took per capita with Charlotte Gilman and Catherine Stetson and with each other.

*(10)   Wills.   Conditions.*

Testamentary provisions:—"Within two months of my death I wish personal property sold to give B. $1,000:"  Then followed a provision for the use of a house as a home for her husband.   "If B. should be in my employ and wish to continue he is to be retained at $40 each month and his room and board, his work to be to take care of the house and give some attention to (her husband).   Should B. not be satisfied after giving it a fair trial he is to receive on leaving $500 with his wages, but should he remain with (husband) during his life, he is then to have $2,000 for his faithful services to us both."

In another part of the will testatrix made provision for her husband in the event that he was not able to live in the house, with no provision for B. The husband never used the house.

*Held,* that the clause relative to B.'s wages was not intended as a gratuity, but as a provision for the support of the husband in a contingency which had not occurred.

*Held,* further, that B. was not entitled to the sum of $500 since circumstances did not allow him to "give it a fair trial" and the legacy of $2,000 was conditioned on B.'s remaining with the husband during his life which could not happen.

*(11)   Wills.   Conditions.*

Where a gift by will is made on an express condition precedent, which becomes impossible of performance (and the existence of impossibility is unknown to the testator), the gift cannot vest.

*(12)   Wills.   Survivorship.*

Testamentary bequest:—"At the death of my said husband, I bequeath all the rest of my said trust estate—'Out of which (the general trust fund) are first to be taken the following bequests, if all the parties are then living, if

not their portion is to be retained in the general fund, until the so-called trust estate is fully closed.'"   "To B. $2,000."

Held, that B. was entitled to the legacy only if he survived the husband, the meaning of the clause being that the gift was not to be paid to his personal representatives, but retained in the general fund.

BILL IN EQUITY.  Certified under Gen. Laws, 1909, cap. 289, § 35.

PARKHURST, J.  This is a suit in equity wherein the bill is filed by the executors and trustees under the will of Julia P. A. Anthony, for instructions on certain questions arising under the will and involving the construction thereof; the case has been certified to this court, for its determination under cap. 289, § 35, Gen. Laws, 1909, being ready for hearing for final decree.

The will of Julia P. A. Anthony is entirely in her own handwriting, and consists of sixteen pages clearly and neatly written on ordinary legal cap paper.  It consists of three clauses, of which the "First" relates solely to directions, as to her burial and that of her husband, to headstones, &c.; the "Second" clause contains directions as to the erection of a certain monument, and the payment of funeral expenses; all these provisions are clear and undisputed.

The "Third" clause of the will under which all disputed questions arise covers the remaining fifteen pages of the will, is all in one paragraph, contains many provisions which are somewhat confusing and, at first sight, contradictory, and inconsistent with each other.  It would seem, from the fact that the testatrix uses much legal phraseology, that she must have had before her one or more wills from which she copied such phrases, but it is evident from the general consideration of the whole will that she was not familiar with the meaning of technical legal terms, and did not intend to use them in their precise technical sense.

This "Third" clause opens with a bequest to Swan Point Cemetery Corporation, of $2,000 in trust to use income for perpetual care of certain lots, &c., then follow directions for

the sale of enough personal property (within two months after her death) to pay certain specific legacies of money, $1,000 each to six named persons; $500 each to six others; $250 each to two others if living; the will then proceeds as follows, all the words in italics being underlined by the testatrix in the will itself: "The balance and rest, of all my property, real and personal, I give to my dear husband, Frederick E. Anthony, for his personal use, during his natural life, with the exception of some personal properties like jewelry, ornaments or dishes, of which I may make especial provision. Within a week or ten days, after my death, I wish my present residence, 185 Adelaide Avenue, to be put in proper condition, as to convenience and safety, so it can be used as a home for my husband, during the balance of his life, or as long as the executors may feel it wise to continue to have him remain in it, with proper care and attention.    One of his peculiarities has been, that however much he might desire to do something, when the time came, he felt he could not then do it, so gentle force may have to be used, to get him to go into the house, but have him if possible understand, it is my wish for him to go there.    I would like Mrs. Ora L. Bell to take the position as housekeeper, and companion, at a monthly salary to be decided by the Executors and herself, she to have an assistant to do the cooking, washing, ironing, and perhaps extra help at certain times.    If Matthew Baynes should be in my employ, and wish to continue, he is to be retained at forty dollars each month, and his room and board. His work to be to take care of the house inside and out, as he has been accustomed to do, and also give some attention to Mr. Anthony, if the latter should need it at times.    Should Matthew Baynes, not be satisfied after giving it a fair trial, he is to receive on leaving five hundred dollars with his wages, but should he remain with Mr. Anthony during his life, he is to then have two thousand (2,000) dollars, for his faithful services to us both.    Mr. Anthony, I desire to have, two attendants, a day, and night one, or still another, if necessary for his comfort.    If the *executors think it wise,* I want a

reliable doctor to see him once a month, or oftener if necessary. A carriage is to be hired for his use, every suitable day, for a drive of an hour or longer, as he may desire. I want it made possible for him to end his days, in his own home, and wish Mrs. Bell and attendants to keep him interested with games, and card playing if possible. His own income is first to be used for his support, and expenses, and after that the income I leave is for his use, outside of what I have bequeathed to a few persons. Should his own income, and that which I bequeath to him, not be sufficient to give him what he actually needs for himself, attendants and, certain luxuries, his own personal property should first be drawn upon, and if that is used up, the executors are requested to draw what is necessary from the principal of my estate. What I want is to have my husband made as comfortable as possible, with his own property, and all I leave behind me, which I bequeath for his personal use during his natural life. After my death, all the property, I possessed, or am in any way entitled, at such time, shall hereinafter be called, my said Trust Estate, and shall be held in trust, during the natural life, of my husband, Frederick Eugene Anthony, to be managed in the following manner, in connection with what I have previously written. All income, exceeding, what is necessary for taxes, repairs, incidental expenses, and salary of the Trustees, to be credited to my estate, but to be used freely for the benefit of my said husband, *whenever his own income,* from the estate of the late Henry Anthony, does not prove at times sufficient, from any cause, but always, his own rightful income, is first to be expended, upon him, and then when necessary, falling back, upon the income accruing from my Trust Estate. I hereby now appoint the following parties, as my Executors, and Trustees of this my last Will and Testament namely: My cousin, George A. Perry, of Galesburg, Illinois; Mrs. Ora L. Bell, of Providence, State of Rhode Island, and my husband's nephew, William Richmond Tillinghast, also of said city and state, as joint tenants in trust, for them, and the sur-

vivors of them, and other the trustees, under these trusts for any time being, all hereinafter called my said trustees, to take charge of, and manage the same. I also give the said George A. Perry, if he feels the position of Trustee, would conflict with other interests, and duties, of his own, *power* to place some one in *this position*, who would consider the Trusteeship, the same as George A. Perry will, if he accepts personally the position. The real estate must be kept in good tenantable repair, and the buildings thereon, for the time being, properly insured against loss by fire, and the personal estate kept invested either in the investments in which the same may be, at the time of my death, without being accountable for any resulting loss in so doing, or from time to time, to change the investments, or any reinvestments, of the same, as my said Trustees, shall deem best; and with power to my said Trustees at any time, or from time to time to build, or make other improvements, additions, or betterments, upon any part, or parts of the real estate in their discretion, but if this is done, it must be done by changes, not affecting the *income* from my estate, to be kept intact for the benefit of my said Husband; and also at any time, or from time to time for any of these purposes, or other purposes of the trusts of these presents, or for the payment of the foregoing legacies, or any or either of them, if they shall deem it wiser, so to do, than to sell the personal estate, therefor or for the purposes of reinvestment, to sell, mortgage, or pledge any of my said trust real estate (except my Mathewson Street Estate now leased for a long term of years, to the Lederer Realty Company, also my estate, cor. of Fountain and West Exchange streets, now leased to Mr. Isaac Hahn for a long term of years, unless all the reinvestments are to be for the direct benefit of my Husband, and if these should not prove sufficient, to assist in carrying out my wishes, he is to have the full benefit of the principal arising from the sale of any of my estate, real or personal), or any of said trust personal estate, and to enter into any contract in respect thereof. With power also at any time or

14

from time to time (providing all Trustees agree in writing) to lease any part or parts of the real estate, for fifteen years, or less, with the understanding that if the time comes to close the Trust, the Lessee, or Lessees, shall have one year to make other arrangements, before moving out of, or from location, if sold, and passed into other hands. And my said trustees shall receive, and collect all of the income of all my said trust estate, and shall pay therefrom all taxes, assessments, and other public rates, and charges, all expenses of insurance, and of ordinary repairs, and other expenses upon, or in respect of, or incident to my said estate, and the care thereof, and the execution of these trusts including their own reasonable compensation, and the *residue* of *said income*, before mentioned, and hereinafter called the said 'net income,' shall until the conveyance, and transfer to my said Husband of parts, of said trust estate, as hereinafter authorized from time to time apply as follows, viz: First, to pay over to my said husband, for his own use, if he be able to care for, and use the same himself, otherwise to apply to his comfortable support and maintenance, in his own home, if possible, and if there is the slightest objection to his living in the house, now numbered 183 & 185 Adelaide Avenue, from any person or persons, the executors are to select three disinterested physicians, to examine into and decide the matter, with the understanding that proper care, and precautions are to be taken for the safety and comfort of my said Husband. If, however, he has to live elsewhere, he is to have the same use of the income mentioned, and for travelling expenses, if able to travel, with a competent and agreeable companion, and with suitable servants, to attend to him, and to properly care for his wants, at all times, an amount while received by him, equal at least to the net income, derived from my Adie Mansion Estate, and The Anthony Annex, on Westminster and Greene Streets, from my estate on Fountain and West Exchange Streets, now leased to Mr. Isaac Hahn, also my estate *between* Washington and Fountain Streets, on Mathewson & Clemence Streets,

now leased to The Lederer Realty Company, also all my property on Atwells Avenue, between Adie and Merrill Streets, and whatever benefit may accrue from the sale of the lots on Academy Avenue, on the Adie Anthony Park plat, and any other real estate now standing in my name, which I may not now have mentioned; also from *all* the *stocks* now standing in my name, as follows: United Traction, Boston and Albany Railroad Stock, Boston and Providence Railroad stock, Narragansett Electric Light Co., and others, which I hold, at the time of my death. Secondly: During the life of my said husband to pay to my cousin Henrietta W. Brown, during her life, an annuity of three hundred dollars, to be paid quarterly, from the date of my death. And all of the residue of said net income, to pay to my husband, for his own use, if he be able to care for, and use the same, if not, as I have said before, deposit it in the name of my trust estate, to be used for any necessity, or *luxury*, which may be for his comfort;    And if at any time, the said net income of my said trust estate, shall not be sufficient for these purposes, or if the income aforesaid set apart for my said husband, shall not be sufficient for his uses as aforesaid, *when added to his income* from *his* late Father's estate, then the deficiency thereof may, from time to time, be raised by sale, mortgage, or pledge of any part, or parts of my said trust estate personal or real, except the Mathewson Street estate, the estate corner Fountain, and West Exchange streets (they being already leased, at this time), for the direct benefit of my said husband.   Provided, and I declare that it shall be lawful for my said trustees at any time, if in their, or his opinion, the health, and condition of my said husband will justify it, to convey, transfer and make over to him, in fee simple, for his own use, discharged of all trusts, the one fourth part of the several stocks (the income from all my stocks, having been set apart for him, in case he was not in condition to look after his own property), and also my said Estate, corner of Fountain and West Exchange Streets, with any improvements, that may then be thereon, subject

however to any then existing lease thereof, but any other then existing incumbrance thereon, if any, to be in that event, paid out of my other estate, or if said stocks, or any of them, or said estate has theretofore been sold, then to pay to my said husband, from any other said estate, other than my said Adie Mansion, and the Anthony Annex estate, an amount equivalent, to the reinvested proceeds derived therefrom; As my husband's income from his Father Anthony's estate, is so connected with what he is to receive from mine, it may be necessary for the two disinterested Trustees, to inquire, the reason if my husband's income from his Father's estate, should be less, from time to time, as for some time, it has averaged two thousands of dollars per annum from the real estate. Should it be necessary for my Husband to continue to live at the Butler Hospital, I desire that my Trustees, will be sure that he has very comfortable rooms and accommodations, as good as the Hospital affords, and a carriage sent every suitable day for him to drive out, if he is willing, or desires to go. I also desire that one of the Trustees shall see him every month personally, and find out if possible, if he desires anything for himself, or anything done for him."

There follow very explicit directions for the care of Frederick E. Anthony in Butler Hospital if he continues to stay there, and various legacies and bequests to take effect after her husband's death, with specific gifts to William R. Tillinghast and various other relatives of Frederick E. Anthony. Also directions as to the care and sale of her property after his death.

The residuary gift is as follows: "Whatever may now be left of the so-called trust estate, I bequeath to the children, and grandchildren, of Maria and William Whipple Brown of Providence, State of Rhode Island, and Charlotte Perkins Gilman, and daughter Catherine Stetson, to be equally divided, share and share alike."

The will ends with the appointment of the executors, George A. Perry, Ora L. Bell and William Richmond Tilling-

hast.   Various provisions of the will other than above which throw light on the construction of the residuary gift and of the gifts to Baynes will be referred to hereafter.

The evidence shows that Julia P. A. Anthony executed her will in 1905, and died in Providence, October 6, 1907.   In 1905 Frederick E. Anthony was sixty-five years old and Mrs. Anthony about the same age,—he had then been an inmate of Butler Hospital nine years.   The will shows that the testatrix knew of his condition, which was one of mental impairment, consisting of apathy, resistiveness and slight delusion.   And she contemplated the possibility of his being obliged to remain at the Hospital indefinitely.

She expressed in her will, however, a desire that, upon her death, her husband move to her Adelaide Avenue residence, if possible, the question of the advisability of his so doing to be determined upon the advice of three disinterested physicians selected by the executors.   (the will above quoted.) The executors selected three such physicians, who were unanimously of the opinion that it would be most unwise for Mr. Anthony to move from the Hospital.   Accordingly, since 1896, Mr. Anthony has remained continually at the Hospital, where he is gradually growing worse.   His condition is described as terminal dementia, with a decline of feeling, amounting to apathy; he has not the power of application to do anything, cannot be diverted, talks only in monosyllables, and does not even ask for food.   His affairs are in the hands of his nephew, Charles F. Tillinghast, a brother of William R. Tillinghast.   As the three experts consulted by the executors, and the assistant superintendent of Butler Hospital are all strongly of the opinion that Mr. Anthony will be better off at that Hospital than anywhere else, it seems certain that Mr. Anthony will never leave the Hospital.   He was seventy years old October 18, 1910.

It also seems certain that Mr. Anthony never has been able since 1896 to take care either of himself or of his property, and that he is absolutely unfitted to take care of property or

the income thereof, or to spend it for his own maintenance and support.

This appears clearly in the testimony of Dr. Hall, the assistant superintendent of Butler Hospital, who has been conversant with the condition of Mr. Anthony ever since 1898.

Mrs. Anthony owned a large amount of property, both real and personal, that she managed herself, and after her husband was sent to Butler Hospital in 1896 she managed his property under a broad power of attorney. Up to the year 1902 she merely received his net income from the trustees of his father's estate. In 1902 the personal property of the Henry Anthony estate was divided and Mr. Anthony's share delivered to Mrs. Anthony. After that time she invested and reinvested this personal estate, keeping a strict account of both principal and income. It is to be noted in this connection that her account books show that Mrs. Anthony spent her husband's own income solely for his support and comfort, never using any of it for her own support and maintenance. The only money of his that she used was money which she borrowed, using the same for making improvements upon her own real estate; and at the time of her death she owed her husband $10,348.83, for which she had made out her note. This represented principal and accumulated income of his estate borrowed by her from time to time. It is in evidence also, that she was careful to keep his expenses within his own income, and objected to paying Butler Hospital more than $50 per week for his care, on the ground that that was all his estate could afford to pay. At that time she asked William R. Tillinghast whether the trustees of the estate of Henry Anthony could contribute to her husband's support out of the principal of the trust estate, and was disappointed because the principal could not be used. Before the death of the testatrix, Mr. Anthony had no private nurse, and paid the Hospital fifty dollars a week. This arrangement continued for nearly three years after her death. In 1910 he was moved to a better suite, and has

since had a special nurse. The change was necessitated by Mr. Anthony's more enfeebled condition. Since 1910 the Hospital has charged Mr. Anthony one hundred dollars a week, but his other expenses are nominal, being only for clothing, carriage hire and the few such other comforts which he is able to enjoy. The entire cost of supporting him as comfortably as possible is about six thousand dollars a year. The net income of Mrs. Anthony in recent years was about twelve thousand dollars per year, and Mr. Anthony's own annual net income, outside whatever he is entitled to under the will in question, has been since 1896 approximately thirty-eight hundred dollars. Consequently an annual surplus income of about $8,800 is being accumulated.

It appears from the bill and answers that the children of Maria and William Whipple Brown, all first cousins of testatrix, living at the death of the testatrix were as follows: Elizabeth Whipple Brown, Henrietta Whitman Brown, Julia Adie Jastram, Maria Perkins Brown, Robert Perkins Brown, and Almira Adie Elder. At that time two of the children of Maria and William Whipple Brown had died, namely, Edward Whipple Brown and Reginald C. Brown. Edward Whipple Brown was not married.

The grandchildren of Maria and William Whipple Brown, living at the death of the testatrix were Bessie V. Polleys, Ethel Abbe, May Field Brown and Gertrude Perkins Brown, all children of said Reginald C. Brown, deceased; Edward Perkins Jastram and Julia Adie Whittaker, children of said Julia Adie Jastram; Madelaine Ray Brown and Robert Perkins Brown, Jr., children of said Robert Perkins Brown; and Marion Perkins Elder, Christine Pearce Elder and Majorie Powell Elder, children of said Almira Adie Elder.

Since the death of the testatrix, Bessie V. Polleys has died, leaving surviving her, her husband, William V. Polleys, and two minor children, namely, William Polleys and Elizabeth Polleys.

No other children or grandchildren of Maria and William Whipple Brown have died, and none have been born since

the death of the testatrix.    Both Maria and William Whipple
Brown are dead; Charlotte Perkins Gilman and Katherine
Stetson are both alive.    At the death of the testatrix there
were living seventeen children and grandchildren of Maria
and William Whipple Brown, and also Charlotte Perkins
Gilman and Catherine Stetson.

The executors and trustees under the will, in their prayers
for instructions, submit the following questions to the court:

1.    Whether the whole net income of said trust estate
belongs to the said Frederick E. Anthony, or only so much
thereof as shall be needed for his support and comfort?

2.    Whether, if the whole net income does not belong
to the said Frederick E. Anthony, the surplus income shall
be accumulated during his life to be paid over with the
principal to those entitled upon his death to said principal, or
can be divided and  paid over from time to time during the
life of said Frederick, and if it may be so paid, to whom it
may be so paid and in what proportions?

3.    Whether the children and grandchildren of William
Whipple Brown living at the time of the decease of said
testatrix took vested or contingent interests under her said
will and if any of them are in any way entitled to any part
of the income of the trust estate, to whom will the share or
income be payable in case of the death of any one of them
during the life of the said Frederick E. Anthony?

4.    Whether Matthew Baynes is entitled under the cir-
cumstances to the monthly wages named in the will since
July 1st, 1908, together with any payments in lieu of his
board and lodging; and whether he is entitled either to the
legacy of two thousand dollars payable to him in case he
remained in the service of Frederick E. Anthony during
his life, and if entitled, at what time he is entitled thereto;
and if  he is not entitled to said legacy whether he is now
entitled to the legacy of five hundred dollars to be paid to
him in case he left the employment of Frederick E. Anthony;
and whether the two legacies of two thousand dollars each
to the said Baynes, one named in the early part of the will

conditional upon his remaining in the services of said Frederick during his life, and the other toward the end of the will as payable on the death of said Frederick are both to be paid, or whether they are intended to be or are in legal contemplation one and the same legacy; and whether either or both of said legacies are payable only upon condition that said Baynes survives the said Frederick?

(1)  In answering these questions, this court will follow the same general principles so often followed in previous cases, in construing the provisions of wills, viz.—that the intent of the testatrix must be gathered from the whole will; *Frelinghuysen* v. *N. Y. Life Ins. & Trust Co.* 31 R. I. 150, 157, and cases cited; and that we will also consider the circumstances under which the testatrix wrote her will, in order to ascertain her intention, "so as to look at it, as far as possible, from the testator's point of view," as was said in *Boardman, Petitioner*, 16 R. I. 131, 145. See, also, *Smith* v. *Bell*, 6 Pet. (U. S.) 68; 30 Am. & Eng. Enc. of Law, 666, 667.

(2)  Now, while it might appear upon the face of the will as above quoted, that it was Mrs. Anthony's intention to give to her husband a legal life estate, in the entire residuary property, real and personal, after the payments provided for under the previous provisions of the will had been made, and her language in the first instance is appropriate for the creation of such a legal life estate, it is only necessary to read the subsequent provisions to become convinced, that she did not so intend, but that, as a matter of fact, knowing, as she did for many years prior to her death, his total mental incapacity for the management of his own estate, which she herself had managed for him for about eleven years prior to her death, the whole scheme of her will was based upon the establishment of a trust estate whereby the legal estate in her property was to be vested in the three trustees named, so that in no event would he be entitled to a legal estate in her property, but only to an equitable interest, except in the event of his restoration to such an extent as to have property turned over to him by the trustees, an event which never

happened, and which in the natural course of things cannot happen.   The whole frame of the will in its "Third" clause is consistent only with an intention which is quite clear to vest her estate in trustees, and to give to her husband only an equitable interest in the income.   It is equally manifest, that while her first language above quoted shows an intent to give him a life estate in the whole income of her property, the subsequent provisions show that it was clearly her intention that the income from his own estate should be used up for his support and maintenance, and that only such portion of her estate should be used, after his own resources (3) were exhausted, as became necessary to furnish him with the support and comforts and luxuries appropriate and necessary for him in his condition, whether it was found expedient and proper for him to live in her residence on Adelaide Avenue, or to travel, or to remain in the Butler Hospital. The minute and detailed provisions and directions to the trustees for his support in any event, whether at her house, or at the hospital, or while travelling, above quoted, are entirely inconsistent with any intention on her part, that her entire income should be turned over to him, or be accumulated in the hands of his guardian, or of her trustees, for his benefit, or that any portion of the income of her estate should be used for him until after the resources of his own estate were first applied.   The constant repetition by her, in various words, in the same paragraph of the will whereby she provides for his support, no less than three or four times, saying explicitly in one place, "His own income is first to be used for his support, and expenses, and after that the income I leave is for his use," coupled with the explicit direction to the trustees that all net income is to be credited to her estate, "but to be used freely for the benefit of my said husband, *whenever his own income*, from the estate of the late Henry Anthony, does not prove at times sufficient, from any cause, but always, his own rightful income, is first to be expended, upon him, and then when necessary, falling back, upon the income accruing from my trust estate," shows most con-

clusively that she intended him to have only such limited use of her income after the exhaustion of his own, and that all remaining net income not so used for his benefit should remain in the hands of her trustees for the benefit of her own estate, to be used in carrying out the subsequent provisions of her will. And it is to be noted that this construction of her intention from the plain terms of the will is entirely consistent with the facts clearly established that she always, during her lifetime, provided for his support out of his own property, and never used any of her own income for his support, so long as she lived.

(4) The mere fact that the testatrix, in the opening sentence of the portion of the will above quoted, used words which, in their technical meaning would be sufficient to create a legal life estate in her husband, will not be allowed to override the plain intent and meaning of the provisions taken as a whole, so as to prevent the creation of the trust estate, or to nullify the other provisions of the will relating to the disposition of the income by the trustees. Where the context or other parts of a will indicate that technical words are not used in their ordinary technical meaning, they will be interpreted by the court in the sense intended by the testatrix. See, *Ross* v. *Nettleton*, 24 R. I. 124; *Cook* v. *First Universalist Church*, 23 R. I. 62; *Gallagher* v. *R. I. Hospital Trust Co.*, 22 R. I. 141; *Bailey* v. *Brown*, 19 R. I. 669; *Homer* v. *Shelton*, 2 Metc. (Mass.) 194, 198; I Redf. Wills, 3d ed. 409.

(5) In answer to the first question above quoted, we are therefore of the opinion that the whole net income of said trust estate does not belong to said Frederick E. Anthony, but only so much thereof as shall be needed for his support and comfort, after the income from his own property has been used.

Other courts have construed similar wills in the manner herein adopted, holding that where a testator in one part of will gives a particular estate and in subsequent passages shows that he means the legatee to take a lesser interest

·only, the prior gift is restricted accordingly. Such sub-:sequent provisions will not take from an estate given quali-ties that the law regards as inseparable from it, but they are ·operative to define the interest given. The fact that there .is no limitation over is immaterial.

A case somewhat similar to that at bar is *Bundy* v. *Bundy*, ·38 N. Y. 410. There a will provided: "I give and devise unto my wife, Clarissa M. Bundy, and Ellen R. Bundy, . . . all my real and personal estate, property, assets and ·effects, subject to my debts. I also further will and direct, that in case either the said Clarissa M. should die without heirs, or that the said Ellen R. should die without heirs, that the proceeds invested for either so dying, after sale ·of my said property, should be equally distributed among the heirs-at-law of my mother.

"And I further will and direct, that my executors, here-inafter to be named, sell and convey my real estate, and convert my personal property into cash; also that the said ·executors invest the proceeds of the sale of both my real .and personal property, in bond and mortgage, or other good securities. I also will and direct, that the said Clarissa M. and the said Ellen R. use respectively so much, or enjoy the use of so much, of the interest arising out of the said bonds and mortgages, or said other securities, or both, as ·shall be necessary and proper for their maintenance and sup-port; and that, if the interest be not sufficient for such main-tenance and support, then they, or either of them, shall receive funds for such support from the principal so in-vested."

The court held that Clarissa was entitled only to an .amount sufficient to support her during life.

*In re Shower's Estate*, 211 Pa. St. 297, a will provided: "After the death of my wife, Elizabeth, I direct all my estate then remaining to be divided equally between all my children, :share and share alike; the trustee or trustees appointed as before provided to receive in trust for my son Frederick and ·daughters Sarah and Clara before named the share to which

each may be entitled respectively" and then this was made
subject to certain restrictions.    The court held that the chil-
dren were entitled only to equitable life estates subject to
the restrictions, and said (pp. 302, 303): "It is settled by
our cases that an estate of inheritance in real estate or an
absolute interest in personalty given in a will may be reduced
to a lesser estate if the subsequent language of the instrument
unequivocally shows that such was the intention of the testa-
tor.    'No principle is better settled,' says Strong, J., in
*Sheets' Estate*, 52 Pa. 257, 'than that, if a testator in one
part of his will give to a person an estate of inheritance of
land, or an absolute interest in personalty, and in sub-
sequent passages unequivocally shows that he means the
devisee or legatee to take a lesser interest only, the prior
gift is restricted accordingly.    Subsequent provisions will
not avail to take from an estate previously given qualities
that the law regards as inseparable from it, as, for example,
alienability; but they are operative to define the estate
given, and so show that what without them might be a fee,
was intended to be a lesser right.'    This language is quoted
with approval in *Snyder's Appeal*, 95 Pa. 174; *Good* v.
*Fichthorn*, 144 Pa. 287, and *Krebs' Estate*, 184 Pa. 222.
.  .  .    Nor is the fact that there is no limitation over of
the principal sufficient to control the quantum of the estate
in the *cestuis que trust*.

*Haring* v. *Shelton*, 114 S. W. 389 (Tex. 1908).    Here a
will provided: "I give and devise unto my beloved wife,
C. C. Shelton, her heirs and assigns forever, the following
described tracts or parcels of land  .  .  .    and it is my
will that my said wife, C. C. Shelton, and her heirs shall
hold said lands in fee simple forever, or so long as she shall
remain a widow."    Although there was no gift over, the
court held that the heirs of the testator could recover the
land from C. C. Shelton's grantee, and said (p. 391): "Here
the limitation of the estate to the widowhood of Mrs. Shelton
is contained in the very terms of the devise and the intention
of the testator is unmistakable.    It is conceivable that the

testator, having it in mind to limit the estate devised to his wife to her widowhood, may have used the language importing, taken by itself, an intention to make an absolute gift, without clearly understanding the import of such language, as repugnant to the limitation; but it is not reasonably conceivable that he would have used, in this very connection, the language 'or so long as she shall remain a widow,' without having the specific intention to vest an estate determinable upon his widow contracting a second marriage. It is true there is no devise over, but that does not destroy the limitation, but leaves the remainder to descend as in case of intestacy. It being clear that the testator did not use the words, 'so long as she shall remain a widow,' without a full understanding of their import, and that they express his intention, we do not think that intention should be defeated by the application of any technical rules of construction."

*Dulin* v. *Moore*, 96 Tex. 135 (1902). In a will were the following clauses:

"Item 2d. To the children of my son, A. B. Moore, he being dead, I give and devise" certain real estate. . . . ·

"Item 9th. I hereby appoint R. R. Dulin of Sherman, Texas, trustee to receive and control the property bequeathed and devised to the children of A. B. Moore. . . .

"Item 10th. I hereby direct and empower the said trustees to keep possession and control of the property bequeathed and devised to their said beneficiaries during the lives of said beneficiaries. Said trustees are not authorized to dispose of any of the body of said property, but are expressly prohibited from so doing, except for the purpose of reinvesting, which last they may do at their discretion. Said trustees are authorized and empowered and directed to expend the rents, interests and profits arising from said property in furnishing the said beneficiaries with necessaries and such other things as may be suitable for the respective beneficiaries, according to their stations in life."

On a suit to construe the will, the court held that Items 9th and 10th ought not to be rejected as repugnant to Item

2d, but with them operated to give the legal estate to the trustee and that Moore's children took only a beneficial interest. The court said (pp. 138, 139): "In this case we must construe clauses 2 and 7 of the will in question in connection with clauses 9 and 10. The language of the two former, if unaffected by the latter two, would by virtue of the operation of our statute have conveyed to the devisees therein a fee simple title to the property. . . . The intention of the testatrix must be given effect, unless prohibited by law. That the provisions in clause 10 do not contravene any rule of law we think clear."

See, also, *Taggart* v. *Murray*, 53 N. Y. 233 (1873); *In re Boulevard from Second St. to Rhawn St.*, 79 Atl. 716 (Pa. 1911).

(6) As to the second question above set forth, whether the surplus income shall be accumulated during Mr. Anthony's life to be paid over with the principal to those entitled upon his death, &c., we are of the opinion that it is the plain intent and meaning of the will that the trustees shall accumulate the income, over and above such portion thereof as may be properly expended for Mr. Anthony's support in accordance with our opinion already expressed; and that such accumulated income becomes a part of the Trust Estate in their hands to be distributed in accordance with the subsequent provisions of the will.

Counsel for Mr. Anthony contend that "there nowhere appears any direct reference to any surplus of income and there is no direction for the accumulation of the surplus for the benefit of the remaindermen," and that there is no ground for implying such a direction. It is true that nowhere has the testatrix used the word "accumulate" or "accumulation." But she gave the following directions: "All income, exceeding what is necessary for taxes, repairs, incidental expenses, and salary of the Trustees to be credited to my estate, but to be used freely for the benefit of my said Husband, *whenever his own income*, from the estate of the late Henry Anthony, does not prove at times sufficient, from any

cause, but always, his own rightful income, is first to be
expended, upon him, and then when necessary falling back,
upon the income accruing from my Trust Estate." It is
our opinion that this direction to "credit" the income to her
estate amounts to a direction to accumulate it, and the testa-
trix, by providing that the trustees may "fall back" upon it
shows an intention to treat the surplus income accruing as
principal. The same idea is expressed in the following
direction to "deposit" the income: "And all of the residue
of the net income, to pay to my husband, for his own use, if
he be able to care for, and use the same, if not, as I have said
before, deposit it in the name of my trust estate, to be used
for any necessity, or *luxury,* which may be for his comfort."
It may be that the vocabulary of the testatrix did not con-
tain the technical term "accumulate," and so to express her
desire to convert the income into capital she used the words
which her business experience rendered familiar to her,
"credit" and "deposit." And that the accumulation was
to be for the benefit of the residuary legatees is made clear
by the residuary clause which disposes of "whatever may
now be left of the so-called Trust Estate," previous provisions
having carefully defined the "so called Trust Estate" and
directed that the income accruing from it should be made a
part of it.

The authorities treat such expressions as directions to
accumulate. The law is summarized in 22 Am. & Eng. Ency.
of Law, 2nd Ed. 728: "In any case where it is made the
duty of the trustee to treat as principal the income of the
trust property, instead of distributing it in the ordinary
course, there is an accumulation."

In *Matter of Estate of Fisher,* 4 Misc. (N. Y.) 46, a will
directed the trustee under it to pay off a mortgage from the
income of the estate. The court held that this in effect
directed an accumulation (which was void under a statute)
and said of the income (p. 47): "It goes into and forms part
of such estate and increases the capital, the income of which is
distributable under the trusts in the will, and the augmented

principal ultimately. The provision is, in effect, precisely the same as if the testator had, in so many words, required the trustee to apply the income to swell the principal of the trust fund."

(7) But no such express direction is necessary. If a part of the income of a trust estate is undisposed of, the trustees should, even in the absence of any provision whatsoever, accumulate it and pay it to the legatees entitled to the original corpus of the estate.

In 22 Am. & Eng. Ency. of Law, 2nd Ed. 729, it is said: "A direction to accumulate need not be express; it may be implied from the terms of a will or deed, as where the instrument disposes of an estate in such a manner that an excess above what is reasonably necessary to carry out the trust necessarily accumulates."

Such was the holding in *Eberly's Appeal*, 110 Pa. St. 95, in which the court (p. 98) used language almost identical with the above. The following are among other cases which recognize and apply this principle: *M'Donald* v. *Bryce*, 2 Keen, 276, *Penrose's Appeal*, 102 Pa. St. 448, *Scott* v. *West*, 63 Wis. 529 (see pp. 573, 574).

(8) As to the second branch of the second question submitted to us, whether such surplus income can be divided and paid over from time to time during the life of Mr. Anthony and if so, to whom and in what proportions, we are of the opinion that the case is not such as to warrant this court in making any order for such payment. While it appears from the evidence that in all probability the principal of the trust estate will be amply sufficient to pay the very numerous pecuniary legacies, payable after Mr. Anthony's death, some thirty-seven in number, and amounting in the aggregate to the sum of upwards of $50,000, without its being necessary to resort to the accumulated income of the estate, nevertheless, as very large portions of both real and personal estate are specifically devised, and bequeathed, and other portions of real and personal estate will have to be sold to raise the necessary funds, and it cannot now be known what

will be realized from such sales, it cannot at present be accurately determined whether there is sufficient property to carry out all of the provisions of the will and still leave the accumulated income intact. It is further to be noted that the testatrix in making these numerous bequests divides them into several classes, and constantly provides for abatement in case there is not enough remaining to pay them all. No case is cited on behalf of the children and grandchildren of Maria and William Whipple Brown, for whose benefit and to whom such distribution is urged, which is like the case at bar, or in which there are so many bequests to be provided for. The case of *Barstow* v. *Thomas*, 20 R. I. 561, is not directly in point, as in that case, the time for the distribution of the estate subject to an annuity and certain expenses, expressly provided for in the will, had arrived, and the question of anticipated distribution was not involved; and the real question was as to the amount of property which should be retained by the trustee to provide for the annuity and expenses. In the case of *Harbin* v. *Masterman* (1896), 1 Ch. 351, which was a case of anticipated distribution, there were several annuities charged upon the estate, but all of the annuitants except one consented to the distribution, and it was clearly shown that the annuity of the one objecting was amply secured by a deposit of government stock or consols; and it further appears in the report of the case that this ostensibly objecting annuitant was not actually objecting in good faith, but had allowed her counsel to use her name for ulterior purposes of his own, for which he was severely reprimanded by the court, and ordered to pay costs. The other cases cited to this point have no more bearing upon the case at bar than the two last above referred to.

For the reasons above given we do not find in the present case any reason for ordering any distribution of the accumulated income prior to Mr. Anthony's decease.

(9) As to the third question, whether the children and grandchildren of William Whipple Brown living at the time of the decease of said testatrix took vested or contingent interests

under her said will and if any of them are in any way entitled
to any part of the income of the trust estate, to whom will
the share or income be payable in the case of the death of
any one of them during the life of the said Frederick E.
Anthony, we are clearly of the opinion that the said children
and grandchildren, together with Charlotte Perkins Gilman
and Catherine Stetson, who are specifically named herein-
before, together took a vested remainder in the residuary
estate, at the death of the testatrix, subject to the limited
equitable life estate of the said Frederick E. Anthony, as
above set forth; that Bessie V. Polleys who has since died,
became entitled to a vested estate in remainder the same as
the others, and that her interest was descendible and trans-
missible to her heirs, so far as it is an interest in real estate,
and to her husband as to such portion of the residuary
estate, as consists of personal property (unless she has dis-
posed of her interests by will).

The rule laid down by this court in *Greene* v. *Rathbun*,
32 R. I. 145, 156–7, is entirely applicable to the question
now under discussion, both as to the vested interests of the
said children and grandchildren, and of said Charlotte
Perkins Gilman and Catherine Stetson; and also as to the
interests of said Bessie V. Polleys and her husband and
children.

It is also to be observed that the rule in *Greene* v. *Rathbun*,
*supra*, involves the further finding that the remainder
vested in these children and grandchildren, is subject to
open and let in any grandchildren who may be born after the
death of the testatrix, and before the death of Frederick E.
Anthony, at which time the estate will vest in possession and
be distributed (see p. 157). This furnishes an additional
reason, if any were needed, why none of the income of the
estate should be distributed during the life of Mr. Anthony,
because there can be no legal certainty that other grand-
children will not be born during his life, and thereby become
entitled to share in the distribution of the residuary estate.

It is also clear that, under the terms of the residuary

clause, the said children and grandchildren take *per capita* with Charlotte Perkins Gilman and Catherine Stetson and with each other. In the absence of expressions of a contrary intention, a gift to "A and the children and grandchildren of B" gives each child and grandchild a share equal to A's and to that of each other child and of each other grandchild. In *Guild* v. *Allen*, 28 R. I. 430, 436 (1907), Mr. Justice Johnson said: "In general, where a gift is to the children of several persons and the children of another person, they take *per capita* and not *per stirpes*." See, also, Schouler, Wills, 2d Ed. Sec. 540; 2 Jarman, Wills, 5 Amer. Ed. 756, and cases cited. Moreover, the words "to be equally divided, share and share alike," show unmistakably that this was the intention of the testatrix.

(10) In answer to the fourth question above stated we are clearly of the opinion that Matthew Baynes is entitled to nothing more than he has already received under the will, unless he survives Frederick E. Anthony, and in that event he will be entitled only to one legacy of $2,000. Baynes is not entitled to $40 a month with payments in lieu of room and board during the life of Mr. Anthony. The following extracts will throw light on Baynes' rights: After the directions for burial, monument, and cemetery, the testatrix directs: "Within two months of my death, I wish enough personal property to be sold to give" (inter alia) "to Matthew Baynes," . . . "one thousand dollars ($1,000)." . . . Then follows the gift of the residue to her husband and directions that the Adelaide Avenue house be used as a home by her husband, if possible. The testatrix provides: "I would like Mrs. Ora L. Bell to take the position as Housekeeper, and Companion, at a monthly salary to be decided by the Executors and herself, she to have an assistant to do the cooking, washing, ironing, and perhaps extra help at certain times. If Matthew Baynes should be in my employ, and wish to continue, he is to be retained at forty dollars each month, and his room and board. His work to be to take care of the house inside and out, as he has been

accustomed to do, and also give some attention to Mr. Anthony, if the latter should need it at times. Should Matthew Baynes, not be satisfied after giving it a fair trial, he is to receive on leaving five hundred dollars with his wages, but should he remain with Mr. Anthony during his life, he is then to have two thousand (2,000) dollars, for his faithful services to us both. Mr. Anthony, I desire to have, two attendants," and other minute directions as to how Mr. Anthony is to be cared for.

The clause in question reads: "If Matthew Baynes should be in my employ, and wish to continue, he is to be retained at forty dollars each month, and his room and board." It is inserted in the midst of minute directions for the care of Mr. Anthony, all of which rest on the condition that Mr. Anthony should be able to occupy the Adelaide Avenue house. The very work for which this is to be given to Baynes is care of this house, "inside and out, as he has been accustomed to do, and also give some attention to Mr. Anthony, if the latter should need it at times." In another part of the will, the testatrix makes directions for the care of her husband in event of his not living in the Adelaide Avenue house, and in this part there is no provision whatever for Baynes. An absolute legacy of $1,000 is given Baynes in the first part of the will, and another legacy of $2,000 is given him in a clause near the last part of the will referred to hereafter. In the light of these circumstances, it is clear that the clause under discussion was intended not primarily as a gratuity to Baynes, but rather as a provision for the support of Mr Anthony in a contingency which has not occurred.

The executors have paid Baynes the legacy of $1,000 provided for in the early part of the will. As Mr. Anthony could not live in the Adelaide Avenue house, the executors closed it, after giving Baynes one month's notice that they should not require his services there after July 1, 1908, and paying him his stipulated compensation of $40 a month to that date. As the testatrix died October 6, 1907, Baynes

received in all payment for about nine months' service at the rate directed in the will. As he cannot render further services, even though it is through no fault of his own, he is obviously not entitled to any further payment. A similar question came before the court in *In re Dempsey*, 25 N. Y. Misc. 257 (1898).

There a testator made a gift to a charity, for the support and maintenance of his wife, the charity to retain any balance for its own benefit. The wife died before the testator, and the court held that as the gift was made for a service which the charity was prevented by circumstances from performing, it could not get the gift.

Baynes is not and never will be entitled to anything under the clause, "Should Matthew Baynes, not be satisfied after giving it a fair trial, he is to receive on leaving five hundred dollars with his wages, but should he remain with Mr. Anthony during his life, he is then to have two thousand (2,000) dollars, for his faithful services to us both."

The testatrix evidently contemplated the possibility of Baynes' being dissatisfied with working for a person of Mr. Anthony's peculiarities, but wished to give him every incentive to stay with Mr. Anthony, and so carefully provided to reward him "for giving it a fair trial," making dissatisfaction after a fair trial a condition precedent. This contingency has not occurred—Baynes was not shown to have been dissatisfied, but circumstances did not allow him to "give it a fair trial."

The gift of $2,000 is conditioned in unambiguous terms on Baynes' remaining with Mr. Anthony during his life, and this contingency cannot happen.

(11)    The law is well settled that where a gift by will is made on an express condition precedent, which becomes impossible of performance (and the existence of impossibility is unknown to the testator), the gift cannot vest. The cases on this point are numerous. The following are illustrative:

*Priestley* v. *Holgate*, 3 K. & J. 286 (1857). The will provided: "Whereas  .  .  .  James Priestly" "has emi-

grated to Australia, I give . . . him, in case he remains in Australia or out of this kingdom, 600 l; to be paid to him twelve months after the decease of my wife; but if he return to England before her decease, I give and bequeath to him the further sum of 400 l." Several years before the death of the widow, Priestly took passage on a boat for England, with intention of returning, but was drowned, with all on board. The court refused to allow the additional £400 to his representative.

*Higgins* v. *Eaton*, 178 Fed. 153 (1910). Here a legacy of $100 a month was left to a sister, provided that she cared for a mute brother during his lifetime. The brother, however, lived elsewhere; and the court, saying that it was immaterial that the sister was willing to care for the mute, held that she was not entitled to the legacy.

*Colvin* v. *Pairpont*, 9 Ky. L. Rep. 191 (1887). The complainant's bill alleged that the testatrix left $200 to him in case he should live with and care for her as he was then doing until her death; that he lived with and cared for her for several years, until she ceased to have a house and gave him no place where he could stay with her. The court sustained a demurrer to the bill.

*Fisher* v. *Fisher*, 113 N. W. 1004 (Neb. 1907). A testator contemplating his future inability to look out for himself, provided that if his son should care for and support him during the remainder of his life, he should have a certain piece of land. The son thereafter gave his father whatever care he required and rendered many personal services, but, owing to a change in circumstances, his father required him to support him financially only to a small extent. The court held that the son was not entitled to the land.

· *Stark* v. *Conde*, 76 N. W. 600 (Wis. 1898). The will provided, "If at that time (when nephew attains the age of 30 years) said trustee deems my said nephew competent to care for. . . . the said sum of $10,000, . . . he shall then pay over to my said nephew . . . said sum." The nephew attained the age of thirty about a year before the

death of the testator; and the court held that as there consequently was no trustee at that time, the nephew could in no way get the legacy.

See, also, Jarman, Wills, 5 Am. Ed. 520; 1 Underhill, Wills, 648; Schouler, Wills, 2d ed. Sec. 599.

(12)   Baynes will be entitled to the legacy of $2,000 given him in the last part of the will only if he survives Frederick E. Anthony.   This legacy is one of several pecuniary legacies payable from the general trust fund after Mr. Anthony's death, the provisions of the will throwing light on it being the following: "After my husband's death, and his funeral, and all our other debts, and expenses have been paid, I give and demise certain properties as follows." (Here follow various legacies, none of them pecuniary.)   Then the will continued —"At the death of my said husband, I devise and bequeath all the rest of my said trust estate . . . as follows, viz.:" (Here follow more legacies, none of them pecuniary.) There are next directions for selling certain property, "a reasonable time after the death of my husband," and immediately follow these sentences: "As to the stocks, they are to be held or sold, as executors think best, but their value added to the general Trust Fund, out of which are first to be taken the following bequests, if all the parties are then living, if not their portion is to be retained in the general fund, until the so called Trust Estate, is fully closed. The following legacies, are to be paid, in the order in which they are named; and if my estate hereinbefore set apart for this purpose, shall prove insufficient for the payment of all of them, then they shall abate in the inverse order.   And if my estate proves sufficient therefor, *all* of the following legacies, to be paid free, from all legacy, or other public tax, or duty the same, if any, to be paid from my then remaining estate.   First, I give to Matthew Baynes, now in my employ, two thousands of dollars, ($2,000)" and several other pecuniary legacies.   Although the testatrix expressed her idea rather clumsily, it is obvious that her meaning was "the following bequests are to be paid to those of the follow-

ing legatees then living, and if any one of them is not then living, the amount of his gift is not to be paid to his personal representative or children, but is to be retained in the general fund, and be distributed with that fund as hereinafter provided."

Having now answered all of the questions above set forth, the parties may present a decree for the approval of the court, in accordance with this opinion.

*Tillinghast & Collins*, for complainants.

*Claude R. Branch, Edward P. Jastram, Edwards & Angell*, for Robert P. Brown, *et al.*, residuary legatees.

*Mumford, Huddy & Emerson (Charles C. Mumford*, of counsel), for Frederick E. Anthony.

*Thomas A. Jenckes*, for respondents Polleys.

*William P. Fowler, Comstock & Canning, Patrick P. Curran, John Henshaw, Livingston Ham, William W. Douglas, Hugh J. Carroll*, for various other respondents.

